Agnes Margaret RENNER, as Executrix of
the Estate of William Renner, Deceased,
Plaintiff-Respondent,

v.

Mary WOLVERTON, Defendant-Appellant.
No. 43613.

Supreme Court of Missouri.

Division No. 1.

Nov. 8, 1954.

Rehearing Denied and Opinion Modified
on Court's Own Motion Dec. 13, 1954.

Spurgeon L. Smithson, Kansas City, for appellant.

Clay C. Rogers, Lyman Field, Jack B. Robertson, Rogers, Field & Gentry, Kansas City, Cyril G. Baucke, Kansas City, for respondent.

LOZIER, Commissioner.

William Renner (hereinafter sometimes called plaintiff) had a verdict and judgment for $30,000 against Mrs. Mary Wolverton (herein called defendant) in his suit for damages for personal injuries sustained in a collision between his truck driven by him and an automobile driven by her. Renner died and his widow and executrix, Mrs. Agnes Margaret Renner, was substituted as the party plaintiff.

Defendant contends that the trial court erred in failing to sustain its motions for a directed verdict, in giving and refusing instructions, in admitting and excluding evidence, and in permitting improper and prejudicial conduct by plaintiff's counsel. Defendant also contends that the verdict is excessive.

The time was shortly after 12 noon, Saturday, May 13, 1950, a bright clear day. The site was the intersection of Armour Road and Ozark Street in North Kansas City. Armour runs east-west. Ozark intersects Armour from the north but does not run south of Armour. Both streets are straight and level. The Ozark pavement extended south to the Armour pavement and "flared outward" between the north Armour right-of-way line and the Armour pavement. On the east and west sides of that approximate triangle were combination gutters·

and curbs. On the north side of Armour was a 20 foot pavement for two 10 foot westbound travel lanes. South of those lanes (except in the intersection itself) was a 30 foot dirt strip separating the westbound and eastbound lanes. North of the two westbound lanes was an earth shoulder and a small U-shaped highway ditch. East of Ozark on the Armour shoulder, about 10.5 feet from the north edge of the Armour pavement, was a "bus stop" sign. West of Ozark on the Armour shoulder was a tree, 24 inches in diameter, 2–3 feet from the north edge of the Armour pavement and 2–3 feet from the west edge of the Ozark pavement. Some 5–6 feet northeast of the tree, almost at the edge of the Ozark pavement, was a street light pole, with a guy wire, the lower part of which was several feet west of the pole and, apparently, due north of the tree.

Both Renner and defendant were driving west. There were no other cars on the highway in the vicinity. The collision occurred in the Armour north westbound lane at about the center of Ozark. The car was stopped within a few feet. The truck turned over three times and stopped, on its side, in the medial dirt strip west of the intersection.

Plaintiff's evidence was, and he submitted his case upon the theory that, as he was driving in the north westbound lane, defendant drove up beside him in the south westbound lane, dropped back a little, turned to her right and struck his truck "at or near the left rear thereof" (Instruction 1). Defendant's evidence was that she had previously passed the truck and had returned to the north westbound lane; that, as she neared the intersection and after she had slowed down and signaled a right-hand turn, Renner, driving on the shoulder, attempted to pass her on the right. Her photographic evidence and the testimony of some of her witnesses, was that the collision was between the right wing of her front bumper and her right front fender and the truck's left rear fender. And the jury could have inferred that the right wing of her fender struck the hub of the truck's left rear wheel.

Renner and Mrs. Renner testified that, as the truck approached Ozark, defendant drove up "alongside of, just about even with" the truck. He was in the north westbound lane and defendant was in the south. They were going about the same speed, about 25 m. p. h. Defendant did not pass the truck nor "cut in front of the truck." About 30 feet east of Ozark, defendant turned her car toward the truck. Renner "made a short cut to the right to avoid her hitting me. * * * And my front wheel got into the intersection, good, and something hit me I didn't see." The impact came "from behind me some place or other." Renner had no recollection of events thereafter. The front end of the car was never up to the front end of the truck. "She slackened speed and made a turn like she was going to cut into the side of me, and then she dropped back, there was an impact on the rear end some place or other. All I know is that I heard it and felt it. * * * I didn't know nothing afterwards. * * * She looked as though she was going to turn into the side of me right at the cab where I was sitting." Renner did not know how far "she cut over" and did not think that he "ever got off the pavement at all."

According to Mrs. Renner, Renner swerved to his right about 20–25 feet from the intersection. The impact came just as the truck was entering the intersection. She did not know if the car was "alongside" at the time. "The first thing I knew something hit us from the rear." It was a strong impact; she did not see it but she felt it. She thought perhaps that at that time the truck's rear wheels may have been off the pavement.

Police Officer Koonce testified that, from the debris, the collision occurred in the north lane on Armour about the middle of Ozark. He observed no tracks on the shoulder, which was dry. He tested defendant's car's brakes and "the pedal went almost to the floor. * * * I had to pump them to obtain a braking effect."

Defendant's own evidence favorable to plaintiff was: The force of the impact killed the motor in her car which "just seemed

to stop where it was. * * * It didn't move very far." While her brakes worked all right that day and afterwards, she did not know if her husband had had the brakes repaired after the collision; nor did she know if the impact was strong enough to have damaged the brakes. She did not know whether the point of the impact on the truck was on its side or its back end.

Richard A. Wolverton, 21, defendant's son (who was seated in the front seat with his mother), said that the point of impact on the truck "must have been somewhere on the rear of his truck, probably the rear fender." His mother "barely grazed him, so she wasn't going much faster than he was." In the police court proceeding hereinafter referred to and in the trial of Mrs. Renner's case against defendant, Richard testified that he examined the highway and thought that there was enough room in the north lane for another vehicle to pass his mother on the right. Richard testified at the instant trial that there was room on the shoulder to pass and not strike the bus stop sign.

Marilyn Wolverton, 16, defendant's daughter, was in her mother's car. At the trial of Mrs. Renner's case, Marilyn testified that the right front part of the car hit the truck "at its left rear."

Thomas Stuart witnessed the collision. He was standing 120–125 feet away. At the trial of Mrs. Renner's case, Stuart testified that he "believed" that "the right wheels of the truck were off the pavement and the left wheels were on. I noticed the passenger car turn to the right, and its right fender came in contact with the (truck's) left rear on the wheel." At the instant trial, Stuart said: "The car's right front fender struck approximately in the vicinity of the left rear wheel of the truck; * * * at the time Mrs. Wolverton made her turn to the right, Mr. Renner's car was mostly in front of it, of her car. * * * And so in making that turn she would make a turn towards his side or rear. * * * And at the time she turned to make the turn * * her turn would be more towards the rear rather than the front" of the truck; that

at the time he "saw her turn or cut to the left, the Renner truck, at least the front of it, was ahead of her."

Other evidence will be stated in the course of the opinion.

█ Defendant contends that her motions for a directed verdict should have been sustained because "plaintiff's evidence and trial theory was that plaintiff's truck was hit from the rear," and that "from the rear" can only be construed as meaning that defendant's car struck the back end of the truck; and that that, under plaintiff's evidence, was an impossibility. However, the record clearly shows that such was not plaintiff's theory, and that plaintiff's evidence was not necessarily that the car struck the *back end* of the truck. It is true that Mrs. Renner, who felt but did not see the impact, said that the truck was "hit from the rear"; and that Renner said he was "hit from the rear," "struck from behind" or "there was an impact on the rear end * * * someplace or other." But, viewed in the light of the other evidence heretofore set out, a jury reasonably could find that the Renners' testimony meant that the rear part of the truck was struck, including the truck's left rear side. We so rule.

Such ruling disposes, adversely to defendant, of these contentions (based upon the fallacious assumption that plaintiff's theory, evidence and submission was that defendant's car collided with the back end of the Renner truck): That plaintiff was not entitled to the benefit of defendant's evidence (that her car collided with the left rear side and wheel of the truck), and that the trial court erred in permitting plaintiff's counsel to ask a plaintiff's medical witness two questions (containing the hypothesis that the truck "was run into from behind") and in giving plaintiff-requested Instruction 1 (hypothesizing that the car struck the truck "at or near the left rear thereof").

Defendant next says that "a severe side blow to the truck" was "physically impossible." Defendant argues that the impact damage to both vehicles was relatively

small, that the car stopped within a few feet and that the overturning of the truck was due, not to the impact, but to Renner's sharp turn to avoid hitting the tree in the intersection.

■ While we believe that the jury would have been justified in inferring from the evidence that the car struck the truck "a severe side blow" (the impact stopped the running of the motor of defendant's car), we can assume that such a blow was physically impossible. This, because the degree or extent of the force of the impact is immaterial. It may be that the jury believed that the impact, in and of itself, was not sufficient to cause the truck to turn over three times but that even a relatively light, sudden impact was sufficient to cause Renner to swerve and lose control of the truck and that the truck was upset by Renner's swerve back to his left to avoid hitting the tree. Even so, if defendant was negligent in turning into the truck (and the jury so found) and if the truck was overturned as a direct result of her negligence (and the jury so found), defendant is liable irrespective of the "severity" of the impact of her car upon the truck. The contention is overruled.

■ Defendant's next point is that the court erroneously permitted Officer Koonce to testify that the car's brakes were defective and in refusing her requested instructions withdrawing that testimony "because the defective brakes had no part in the causation of" the collision. However, we can assume without deciding that the evidence should not have been admitted and that the withdrawal instructions should have been given. The matter was not mentioned in plaintiff's instructions and plaintiff's counsel did not refer to it in his argument. Defendant has not demonstrated wherein she was prejudiced by the trial court's actions, and our study of the record shows that the error (if such it was) in no way materially affected the merits of the action. Section 512.160, subd. 2, RSMo 1949, V.A.M.S. See Winkler v. Macon Gas Co., 361 Mo. 1017, 238 S.W.2d 386, 392–393[8, 9]. The contention is overruled.

As stated, at the instant trial Renner and Mrs. Renner testified that defendant did not pass and turn in front of the truck and they did not believe that, in Renner's swerve to his right, the truck left the pavement. Both had testified in a police court proceeding on July 27, 1950, that defendant passed the truck and turned abruptly in front of it and that Renner "possibly" swerved off on the shoulder. A reporter made notes of the testimony in that proceeding and prepared a transcript thereof.

Defendant alleges misconduct by plaintiff's counsel in stating his objections to the manner in which defendant's counsel used a copy of the transcript of the police court proceeding. We need not lengthen this opinion by stating the instances of which defendant complains. Suffice to say, defendant did not offer the transcript itself in evidence and her counsel was permitted, without objection, to use the transcript in formulating his questions in his cross-examination of the Renners and in his examination of the reporter. We agree with the trial judge who told defendant's counsel (outside the jury's presence) that he had ruled the latter's use of the transcript "largely in your favor and I seriously doubt if it was properly ruled, because the transcript was not primary evidence in any respect," and "in your manner of using it, I do think I gave you very much the advantage of it." The assignment is overruled.

■ Defendant next contends that the trial court erred in excluding testimony (offered outside the jury's presence) that the transcript of the police court proceeding was arranged for by counsel for both parties, and that each counsel paid one-half of the cost and was furnished a copy. Defendant has not demonstrated, and we are unable to see, wherein that evidence was in any way relevant. Defendant argues that it went to the credibility of the reporter. However, plaintiff's counsel admitted the reporter's qualifications, did not object to her testifying from her notes as to questions and answers in the police court proceeding and in no way challenged her credibility or disparaged her testimony. The contention is overruled.

Defendant next says that plaintiff's counsel was guilty of intentional and prejudicial misconduct in this: Plaintiff's counsel asked Mrs. Renner, "Without stating who he was, and I direct your attention to the fact that you shouldn't state who he was, did someone come to see you the day following this accident? A. Yes, sir. Q. And try to settle the case (her's against defendant) with you?" Defendant's counsel objected and moved the discharge of the jury. The court sustained the objection and told the jury, "You will disregard the question and give it no further consideration. Q. (By plaintiff's counsel): I will put it this way, Mrs. Renner—" The court did not reprimand plaintiff's counsel as defendant's counsel requested but told the jury, "It is an improper question and you will disregard it." The court denied the request for a discharge of the jury, but again sustained the objection and directed the jury to disregard the question.

■ Assuming without deciding that the question was an improper one, the witness was not a party, see Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, 575[16, 18, 19, 20], 161 A. L.R. 383, we do not believe that the trial court erred in refusing to declare a mistrial. Plaintiff's counsel did not attempt to pursue the matter and did not thereafter refer to it in either his questioning of the witness or his argument to the jury. Whether the particular testimony was so prejudicial as to require the discharge of the jury was within the trial court's discretion and, absent an abuse of that discretion (and we find no such abuse), his ruling must be approved. The contention is overruled.

[6] Defendant contends that plaintiff's counsel was guilty of improper and prejudicial conduct in rehabilitating plaintiff's witnesses. In cross-examining Mrs. Renner, defendant's counsel inquired as to certain portions of her testimony in the trial of her case. Upon redirect examination, plaintiff's counsel asked her as to other portions of her testimony in that case not inquired about by defendant's

counsel in his cross-examination, viz., "the next thing I knew it seemed like something hit us at the left rear wheel; * * that is where we felt the jolt." Plaintiff concedes that plaintiff's counsel's question involved matters not covered in Mrs. Renner's cross-examination as to her former testimony. However defendant could not have been prejudiced because, as stated, defendant's evidence was that the point of impact on the truck was in the vicinity of the left rear wheel and, the jury could have inferred, the car's bumper struck the left rear wheel's hub. The assignment is overruled.

■ On direct examination, Renner testified that he had been involved in an accident "sometime in the early '40s." On cross-examination, plaintiff was asked if in 1944 he was not "blaming his physical troubles on that accident," and as to Renner's suit against the other party involved in that accident. On redirect examination, plaintiff's counsel was permitted to ask Renner if he had not stated, in his deposition given in that suit, that those injuries had all "cleared up." (Plaintiff's counsel's long question included a reference to the other suit as one Renner "never got any money out of and which was never tried." Defendant cannot now complain of that reference as she made no objection thereto.) Defendant's counsel objected to this as "hearsay and self-serving," that the deposition in the other suit had not been referred to by him in his cross-examination of the witness and moved for a mistrial. The objection was overruled. While the objection should have been sustained, the trial court did not err in refusing to declare a mistrial. Renner did not answer the question, and immediately thereafter, testified, without objection, as to the nature of his injuries in the 1942 accident and that such injuries had "all cleared up." The assignment is overruled.

■ Defendant next says that plaintiff's counsel was guilty of misconduct in his rehabilitation of Renner by asking him as to matters to which he had testified in his deposition in the other suit but

about which defendant's counsel had not inquired in his cross-examination. When defendant's counsel objected on the ground that "I did not impeach the witness with this deposition," plaintiff's counsel stated, "In view of that statement, I will withdraw it." Defendant's counsel moved for a discharge of the jury "by reason of this misconduct of counsel in parading this before the jury." The "evidence" was stricken and the jury was instructed not to consider it. Under such circumstances, the trial court did not err in refusing to discharge the jury.

■ Defendant's next point is that the trial court erred in permitting improper impeachment of defendant's witness Stuart and in failing to discharge the jury for misconduct of plaintiff's counsel prejudicial to defendant's right to object to such improper impeachment. In his cross-examination of Stuart, plaintiff's counsel asked if he had not, at the trial of Mrs. Renner's case, "made a statement—." Defendant's counsel objected to the reference to a statement "because it is unsigned by the witness." The objection was overruled and the witness said that the statement was "basicly correct." Defendant's counsel renewed his objection for "the reason that the witness signed no statement." After that objection was overruled, the witness asked plaintiff's counsel to restate the question. Plaintiff's counsel said, "That is the trouble with those objections. Would you read it, please?" When defendant's counsel objected, plaintiff's counsel said: "I apologize for that, Judge, the witness said he wanted the question read back to him." Defendant's counsel renewed his objection and moved to discharge the jury. That motion was denied. There being no abuse of discretion in the trial court's refusal to declare a mistrial, the assignment is overruled.

Defendant's next point is that plaintiff's counsel was guilty of misconduct in making "undue and unfair emphasis, comments and arguments during the hearing of the evidence" and in his argument to the jury. She cites, for example: Plaintiff's counsel's emphasis upon the fact that Renner had to wear a cervical collar 86 days and nights and that the Renners were not in a hurry and there was "no emergency" the morning of the accident; his references to certain of defendant's photograph exhibits as "foggy." We need not lengthen this opinion by summarizing the other instances of which defendant complains under this point. In some, defendant made no objection. In others, the objection was not ruled. In still others, the objection was without merit. In none may it be said that the trial court abused its discretion. The assignment is overruled.

■ Defendant's next point is that plaintiff's counsel was guilty of misconduct and the trial court erred in making certain rulings regarding a photograph of the Renners taken, according to Mrs. Renner, in December, 1949, about 6 months before the accident. Mrs. Renner thought that the photograph was made by "Gold-Tone, a photographer on Grand Avenue." Upon cross-examination, defendant's counsel asked her if she "would consent" to go over on Grand Avenue with his (defendant's counsel's) associate and point out the place. "Will you step off the witness stand now and go with Mr. O'Laughlin, who has his automobile outside the courthouse? A. Well, I guess I can." Plaintiff's counsel stated that "if he wants to do that, I want to go along." Defendant's counsel asked "permission and order of the court that it may be done today at noon." Plaintiff's counsel objected to defendant's counsel's "improper conduct, making a demonstration in front of the jury." Defendant's counsel's request was stricken.

Thereafter, out of the jury's presence, the trial court stated that counsel could make such arrangements as they pleased, but that the court was not going to order Mrs. Renner to go to Grand Avenue and point out where the photograph was taken. Later, outside the jury's presence, defendant's counsel stated that he wanted to make an offer of proof that plaintiff's coun-

sel "didn't perform on his agreement." (Plaintiff's counsel stated that defendant's counsel had not contacted him about making the trip, a statement which defendant's counsel did not deny.) The trial court stated that he would refuse the offer—"attorneys will not be permitted to get on the witness stand and testify about what they took up with the court in chambers and that the court has ruled that the woman didn't have to go unless she wanted to." In the same conference, defendant's counsel requested a continuance "to give the defendant adequate time to investigate the date of the taking of that photograph" and that request was denied.

Upon such a record, plaintiff's counsel was certainly not guilty of misconduct and the unusual, unprecedented offer of proof (that he had broken an "agreement" to let Mrs. Renner go to Grand Avenue) was properly overruled. Defendant cites no authority, and we have been unable to find any, for either proposition that the trial court should have "ordered" Mrs. Renner to make the trip or that defendant's counsel was entitled to testify as to the alleged agreement between counsel. The assignment is overruled.

■ Nor did the trial court abuse its discretion in denying defendant a continuance. The photograph was put in evidence on Tuesday, the second day of the trial. The request for a continuance was made Friday afternoon, just before defendant closed her case. Furthermore, defendant had already offered substantial evidence that Gold-Tone discontinued business in 1944 or 1945, that the photograph could not have been made by Gold-Tone's successor at the Grand Avenue location after 1945, and that such successor had no record of having taken any photograph of Renner. The affidavits attached to defendant's new trial motion as "newly discovered evidence" as to the photograph were but corroboratory of defendant's evidence that the photograph had been taken by Gold-Tone prior to the time Gold-Tone quit business in Kansas City.

■ Nor did the trial court err in refusing defendant's request, made on the last day of the trial, for an order that a photograph be taken of Renner before the close of the case for the purpose of putting into the record Renner's physical appearance at the trial. Assuming without deciding that such an order would have been proper, the request came, as the trial court said, "too late."

In ruling defendant's new trial motion, the trial court found that plaintiff's counsel was not guilty of persistent and intentional misconduct. We agree. This, because our careful examination of the instances of which defendant complains has convinced us that the instances, taken singly or all together, were not deliberate or intentional but were the result of "heat of battle" in a hard-fought trial. Each party was represented by an experienced and distinguished member of the Jackson County Bar who, respectively, aggressively presented and vigorously defended his client's case. The record shows that the trial was a continuous five-day combat— a fierce struggle that often taxed the patience of the veteran trial judge who kept control of the proceeding with difficulty—and that, both in and out of the jury's presence, each counsel repeatedly complained of the conduct of his adversary. The assignment is overruled.

■ Defendant's final contention is that the verdict was excessive. Plaintiff was 62 years old at the time of the collision (64 at trial time with a life expectancy of 12 years). For 32 years he had worked as a railroad "carman." His work (40 hours a week) consisted of repairing "train lines" and cleaning and testing car air and retainer pipes and brakes. His annual wages averaged approximately $2,700. His loss of wages to trial time was approximately $6,300. A carman's work is heavy manual labor performed beneath the cars outdoors. He also did manual labor around his house and his farm. He had been in good health and had never sustained injuries to or suffered from disability, weakness or pain in his neck, "low back" or

left shoulder. He had been physically unable to work either as a carman or around his home or his farm, since the collision. His hospital bill was $284.70. He owed doctors' bills but the amounts thereof were not shown.

At the hospital after the collision, plaintiff was placed in head traction on a bed on fracture boards. When bronchial pneumonia developed, a cervical collar was substituted for the traction. His abdomen became distended and he was fed intravenously and intestinal gas was removed by a tube down his esophagus. The distended abdomen resulted from nerve paralysis, and (according to plaintiff's doctors) is a condition frequently associated with a fracture of any part of the spine.

Plaintiff was in the hospital almost a month. He wore the cervical collar for 86 days and nights (23 while in the hospital) and thereafter intermittently for several weeks. His weight went down from 155–160 pounds to 115 at trial time. He has bad headaches (due, his doctors said, to nerve injuries in the neck). At trial time, he could no longer do manual labor or even drive a car or truck because of his neck, shoulder and back pains. He still has constant neck pains. He could not walk 2 blocks without sitting down.

Plaintiff's injuries consisted of "a broken neck"—a compressed fracture of the second cervical vertebra—and aggravation of pre-existing arthritis of the spine in both the cervical and "low back" or lumbarsacral regions. The fracture extended into the joint area and "healed out of place," a misalignment; there were changes in the third, fourth, fifth and sixth cervical vertebrae and a narrowing of the disc spaces, the result of which was impingement of the nerves leading out of the spinal cord at those points, producing irritation and pain and, in time, damage to the nerves themselves. The range of the neck rotation was limited by approximately 40%. By trial time, plaintiff's left shoulder was "frozen," i. e., there was no motion in the shoulder joint itself. His neck condition alone "would make him unable to engage" in heavy manual labor "because the man can't use his upper left arm."

The aggravation of arthritis in the lumbar-sacral region caused pain and is "a real disability in his lower back." There was a kyphosis in the dorsal area—the spine curves backward instead of being straight. If he attempts heavy lifting "or anything that requires excessive use of his back, he is going to have pain." His back condition, apart from his neck condition, had disabled him from heavy manual work. "Both side and back bending are about 50% of normal." Plaintiff could never engage in work as a carman or any sort of manual labor. The neck, back and shoulder conditions are permanent and will become worse. Considered together, plaintiff was "100% disabled permanently."

Defendant argues that, under plaintiff's evidence, "it should be readily manifest that he did not have and there was no evidence that he did have a normal life expectancy." In Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42, the evidence was that Dempsey's life expectancy was 25.07 years. Dempsey died 13½ months after the trial from a cause not related to his injuries. We held that proof of that fact "would not establish he did not, at the time of the trial, have a life expectancy of 25.07 years. * * * The expectancy tables not only take into consideration the known fact that any person may die prior to his calculated expectancy but also the known fact that he may live far beyond that period." 251 S.W.2d 46[6].

Defendant offered no medical evidence. The trial court (who, in ruling defendant's new trial motion, weighed the evidence and directly passed upon the excessiveness issue) did not consider the $30,000 verdict excessive.

Defendant cites Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856, and Lynch v. Baldwin, Mo.Sup., 117 S.W.2d 273. Plaintiff cites Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, Lesch v. Terminal R. R. Ass'n, of St. Louis, Mo.Sup., 258 S.W.2d 686, Pinter v. Gulf, Mobile & Ohio R. Co., 362

Mo. 887, 245 S.W.2d 88, and Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42. We have considered these and other cases. Taking into account the nature, extent and permanency of plaintiff's injuries and disability, his past and probable future pain and suffering, his age, his loss of earnings to trial time, his reasonably probable loss of future earnings, the present purchasing power of the dollar, and having regard for the rule of uniformity of awards, we may not say that the verdict was excessive.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.