**Ray SNYDER, Respondent,**

v.

**Dr. Leland JENSEN and Oral H. McCubbin, Administrator of the Estate of Edward Pace, Deceased, Appellants.**

No. 44678.

Supreme Court of Missouri.

Division No. 1.

July 11, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied and Opinion Modified on Courts Own Motion Sept. 12, 1955.

See, also, 281 S.W.2d 819.

Charles F. Hamilton, J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for appellant, Dr. Leland Jensen.

Wilbur C. Schwartz, St. Louis, for appellant Oral H. McCubbin, Administrator of the Estate of Edward Pace, Deceased, Joseph Nessenfeld, St. Louis, of counsel.

Barnhart, Wood & Bransford, Cleo V. Barnhart, St. Louis, for plaintiff-respondent, Ray Snyder.

COIL, Commissioner.

On February 8, 1953, at about 9:30 a. m., two automobiles and a truck were involved in an accident on east-west Highway 166 (22'-wide black-top on which was a white center line, with red clay and rock hard-packed 10' shoulders on each side) between Joplin and Springfield. Respondent Ray Snyder (herein called plaintiff) was a passenger in appellant's (Dr. Leland Jensen's) Chrysler automobile proceeding eastwardly. Mr. and Mrs. Edward Pace were proceeding eastwardly in their Cadillac automobile which struck the left rear of a milk truck

as it proceeded eastwardly under the circumstances to be related. Both Mr. and Mrs. Pace were killed. Mr. Pace's estate is an appellant through Oral H. McCubbin, its administrator. At the time of the events herein described, the highway was dry, the weather clear, and there was no other involved traffic.

Plaintiff sustained injuries and had a $40,000 judgment therefor against both appellants who, either or both, contend: that plaintiff failed to make a submissible case; that the trial court erred in giving instructions and in admitting evidence; and that the verdict was excessive and so excessive as to indicate the jury's passion and prejudice.

The evidence, viewed from a standpoint favorable to plaintiff, justified the jury in finding the facts to be as they appear in this statement. The Cadillac-truck collision point was about 10 feet west of the west edge of a farm entrance or driveway which ran northwardly from the north edge of the pavement. The west edge of this driveway was 600 feet east of the crest of a hill. As Jensen drove east in the south right lane at 70 to 100 miles per hour, the Pace Cadillac preceded him by 75 feet. When the Cadillac was about 100 feet west of the hilltop, it crossed the center line into the north or westbound traffic lane and proceeded eastwardly. Jensen continued in the south or eastbound lane at a speed which maintained a 100′ interval between his and the Pace car. When the Chrysler was about 90 feet west of the hilltop, Jensen saw the milk truck 690 feet to the east (about 90 feet west of the driveway) with its left wheels to the left of the center line, angling northeastwardly in a left turn into the driveway. At that time, Jensen "realized that there was a probability of a collision between the Cadillac and the milk truck" and removed his foot from the accelerator, placed it at the brake pedal, but did not apply the brakes until the Cadillac "brake lights" flashed on at a place 290 feet west of the collision point. The Cadillac left skid marks in the westbound traffic lane parallel with the center line for a distance of 45 feet; then careened or skidded in a sideway position (its front facing south and slightly east and its rear north and slightly west) for a distance of 160 feet into collision with the left rear of the milk truck. As the Cadillac skidded, and for a short distance prior to the collision, its front extended into the eastbound lane 4 or 5 feet. The driver of the milk truck (a 2½-ton G. M. C. equipped with a 2,400-pound "milk bed" and loaded with 8,700 pounds of cans and milk) saw the two automobiles approaching from his rear as they came over the crest of the hill. At that time the milk truck was 3 or 4 feet into the north lane, 40 feet west of the driveway, and 30 feet west of the collision point. Prior to the collision, the milk truck changed course from northeast to southeast in an attempt to get back into the eastbound traffic lane. At the time the Cadillac struck the truck, the truck's left rear dual wheel was 3 or 4 feet north of the center line and the truck body extended 2 or 3 feet beyond the rear wheels. The left front side of the Cadillac went under the rear of the truck body, striking the inside of the left dual wheel, causing the Cadillac to be whipped around in a complete circle to the west so that it came to a stop on the north shoulder about 75 feet east of the impact point, with its front end about 10 feet north of the north edge of the pavement. After the impact, Kennedy drove the milk truck onto the south shoulder and stopped about 300 feet east of the collision point.

In the meantime, Jensen had continued eastwardly in the eastbound traffic lane. His Chrysler left a 60′-long skid mark which began 75 feet west of the place where the truck and the Cadillac collided. When Jensen reached a place about 15 feet west of the collision point, he drove his car off the highway and traveled on the shoulder for 25 feet, then turned southeast into a shallow bar ditch and continued eastwardly for about 200 feet where his automobile struck a culvert and overturned. Jensen said he turned off the pavement to avoid collision with the Cadillac; that he went across the shoulder and into the bar ditch to be clear of an apprehended danger of the

Cadillac and truck coming onto the shoulder as a result of their collision; that he continued on with the intention of stopping in the ditch at about the location of the culvert, but that just before he reached that point he, for the first time, saw the culvert and, in order to avoid striking it, turned back toward the pavement; that the angle between the shoulder and the bar ditch had become greater as he went eastwardly and, in his attempt to turn back onto the pavement, the Chrysler overturned.

Jensen also testified: that he was going 70 m. p. h. when he first saw the milk truck and realized the probability of a collision between it and the Cadillac; that he turned off the highway at a 45-degree angle at a speed between 40 and 55 m. p. h.; and that he could have stopped his Chrysler at 70 m. p. h., under the conditions there obtaining, within 300 feet. Other necessary evidence will appear in the ensuing discussion.

The case was submitted by plaintiff against Jensen by two separate verdict-directing instructions. One hypothesized excessive speed under the circumstances and the other Jensen's failure to stop on the pavement before reaching the place of collision between the truck and the Cadillac. Jensen contends in his brief that no submissible case was made on excessive speed. An examination of the argument, however, makes it apparent that the contention is, in reality, not that plaintiff failed to adduce evidence from which a jury reasonably could find that Jensen's excessive speed was a proximate cause of plaintiff's injury, but rather that *speed as submitted* in plaintiff's instruction 1 was not a negligent speed and, in any event, could not have been a proximate cause.

■ There can be no doubt that plaintiff's evidence was such that a jury reasonably could have found that Jensen's speed was excessive under the circumstances and was a substantial factor in causing Jensen to drive his automobile off the pavement and into subsequent collision with a culvert some 225 feet to the east. This conclusion is demonstrable by the fact that, although Jensen could have stopped in 300 feet, and although, under the evidence most favorable to plaintiff, Jensen had over 600 feet in which to stop after he realized the danger of a collision on the highway a short distance ahead of him, he not only failed to stop but decreased his speed only to 40–55 m. p. h. The fact that a jury reasonably could have found that Jensen was guilty of negligent acts and omissions other than excessive speed which may have also proximately contributed to cause plaintiff's injury, did not, under the facts here, prevent plaintiff from going to the jury on Jensen's negligent speed which contributed to cause his injury; and this, even though the injury would not have occurred but for the occurrence of other negligent acts or omissions. Horrell v. St. Louis Public Service Co., Mo., 277 S.W.2d 612. The jury reasonably could have found that Jensen's excessive speed contributed to the necessity for him to leave the pavement and that his turning off the pavement proximately contributed to cause plaintiff's injury.

Instruction 1, in pertinent part, required the jury to find that the milk truck "was being operated in an eastwardly direction on Highway No. 166 and was approaching the farm entrance * * * with its left wheels to the north of the center line of the highway and in a gradual turn to the left toward said farm entrance and * * * that *at said time* the Cadillac automobile * * * was being operated in an eastwardly direction * * * approximately 600 feet to the west of said farm entrance and at or near the crest of the hill * * * on the north half of said highway * * * and * * * that *at said time* the Chrysler * * * was being operated eastwardly * * * on the south half of the pavement * * * within 100 feet [of the Cadillac] * * * and * * * that [both automobiles] were *then being operated* at a rate of speed of seventy (70) or more miles per hour, and if you find that the speed that said Chrysler automobile was being operated, under the aforesaid circumstances and conditions, was high, excessive and dangerous

and * * * that * * * Jensen, in so operating said Chrysler * * * was thereby negligent * * *." (Italics ours.) The remainder of the instruction hypothesized the movement of the Cadillac into the south half of the pavement and into collision with the milk truck, Jensen's turning off the pavement to avoid collision with the Cadillac, and Jensen's subsequent collision with the culvert, and required the jury to find that the negligent speed theretofore hypothesized was a direct and proximate cause of the injury, either alone or combined with the negligence of Mr. Pace and the driver of the milk truck.

Now, under one construction of the language, that the automobiles "were *then* being operated", it is apparent that plaintiff limited the time and duration of the speed hypothesized to the exact instant when Jensen's automobile was 700 feet west of the farm entrance or 690 feet west of the Cadillac-truck collision point. Under this construction it is apparent that a jury reasonably could not find that the 70-mile-per-hour speed was negligent. This, because it was not until Jensen reached the exact place hypothesized that there was any circumstance which would make that speed excessive. We think, however, that the language that both automobiles "were then *being* operated" and "in so operating said Chrysler" clearly implied that the hypothesized speed of 70 m. p. h. or more continued for some unfixed time and distance beyond the exact instant and location hypothesized in the instruction. Even so, however, it is true that the instruction failed to include any hypothesis as to Jensen's speed subsequent to the time and place hypothesized, except for the noted implied unfixed, indefinite, and speculative time and distance.

Plaintiff's evidence was that Jensen turned off the pavement at a speed of 40–55 m. p. h. Thus, it is clear that whatever Jensen's speed at the place hypothesized in the instruction, and however long that speed continued, such speed did not continue for the entire 665 feet to the place where Jensen left the pavement. On the contrary, that speed was reduced somewhere along the line to 40–55 m. p. h. It would appear, therefore, that the evidence showed that it was Jensen's failure to stop or, conversely, his continuing at such a speed (whatever it was) for 665 feet as to make it necessary or appear necessary for him to turn off the pavement in order to avoid a collision, which were proximate causes of plaintiff's subsequent injury. However, as we have said, the instruction did authorize the jury to find that Jensen continued for *some* time and distance at 70 or more miles per hour after he had reached the place 690 feet from the collision point and after he realized, and should have realized from the circumstances hypothesized, the probability of a collision on the highway a short distance ahead. We, therefore, are not prepared to say as a matter of law that a jury reasonably could not find that if Jensen continued for any distance (from the place 690 feet away) at a speed of 70 or more miles per hour, such was an excessive speed under the circumstances and proximately contributed to cause the apparent necessity for the Chrysler to turn off the pavement.

It is true, as Jensen points out, that his testimony (plaintiff's evidence) was that he could have stopped in 300 feet. Jensen forcefully argues that, therefore, his speed at a place 690 feet away from, and prior to 300 feet short of, the collision point was too remote to have been a proximate cause. While we think there is considerable merit in this argument and that the instruction could have been so drawn as to better submit the facts pertaining to the speed issue, nevertheless, if Jensen continued at a speed of 70 or more miles per hour when, under the circumstances, he should not have done so, it should have been and it was the jury's province to determine whether that continuation of the hypothesized speed, even for a short distance, contributed to the ultimate necessity for Jensen to turn off the pavement. And there was evidence from which the jury reasonably could have found that Jensen's speed did continue at 70 or more miles per hour for some distance, despite Jensen's testimony that he removed his foot from the accelerator when 690 feet

away and had reduced his speed to 55 m. p. h. by the time he left the pavement.

■ It is said that "The instruction gave the jury a roving commission to conjure up any theory of liability arising from the operation of the Chrysler" between a place 690 feet west of the Cadillac-truck collision point and the point over 200 feet east thereof where the Chrysler collided with the culvert. But if the jury found, as we have held was reasonable under the evidence, that Jensen's excessive speed contributed to cause him to turn off the pavement to avoid collision with the Cadillac, this finding was sufficient to authorize the jury to find that Jensen's excessive speed was a proximate cause of plaintiff's injury. There was no dispute in the evidence as to Jensen's conduct or course after leaving the pavement. Thus there was no necessity to hypothesize the evidentiary facts as to Jensen's other possible contributing negligent acts or conduct from the time he turned off the pavement, so long as the jury could have reasoned from the facts that Jensen's leaving the pavement was a substantial factor in causing him subsequently to overturn. The instruction required a finding that excessive speed under the circumstances did cause or contribute to cause plaintiff's injury. We are of the opinion that, under the facts here, that requirement was sufficient.

Nor can we agree with Jensen that the instruction was so drawn as to ignore, and thereby direct the jury to disregard, his testimony that he reduced his speed as the Chrysler moved eastwardly. What we have said heretofore on the question of whether the instruction sufficiently submitted speed as a proximate cause, in effect, answers this criticism. For if, despite Jensen's testimony as to reduction of speed, the jury reasonably could have found that he, nevertheless, continued at a speed of 70 or more miles per hour for some distance after he should have acted to stop, and if, as we have held, the jury could have found that such speed proximately contributed to plaintiff's injury, it follows that Jensen's reduction of speed was not a fact, from plaintiff's standpoint, which the jury must have found or

necessarily considered in order to find Jensen liable.

■ Further, as to instruction 1, Jensen contends that because instructions 3 and 4, which submitted plaintiff's case against McCubbin, hypothesized that the Cadillac driver, Pace, brought about the situation which caused Jensen to turn off the pavement, "it is obvious that there was no causal connection between the speed of the Chrysler and its movement off the paved portion of the highway." It is clear to us that the quoted conclusion does not follow from the stated premise. True, Jensen would not have turned off the pavement but for the apparent necessity created by the Cadillac-truck collision, which the jury could have found was proximately caused by Pace's negligence. But, likewise, Jensen would not have turned off the pavement but for his causal negligent speed. The jury reasonably could find that Pace's and Jensen's concurrent negligence proximately caused Jensen to leave the pavement which, in turn, was a substantial factor in causing injury to plaintiff as a reasonably probable consequence thereof.

■ Jensen says that instruction 1 failed to hypothesize an essential fact or circumstance, shown by plaintiff's evidence, which the jury had to consider in determining whether Jensen's speed was excessive. This, that prior to the time the Cadillac struck it, the milk truck had turned southeast and some portion of it was, at collision time, in the eastbound lane. This contention overlooks the fact that the jury reasonably could have found that Jensen continued at a causally excessive speed prior to and before the truck partially re-entered the eastbound lane. That is to say, under the evidence considered favorably from plaintiff's standpoint, the jury reasonably could have found that the truck's re-entering the eastbound lane occurred too late in the sequence of events to have been a circumstance which could have affected the causality of Jensen's speed. Thus, from plaintiff's standpoint, the noted circumstance was not an essential one which plaintiff must have hypothesized.

Jensen further contends that no submissible case was made on the theory embodied in instruction 2. That instruction submitted Jensen's failure to stop on the pavement at a place west of the Cadillac-truck collision point. Plaintiff points out that Jensen did not move for a directed verdict at the close of all the evidence or submit the question of submissible case to the trial court in any after-trial motion. But the question of submissibility is necessarily involved in determining one of Jensen's assignments of error as to instruction 2. Inasmuch as we have reached the conclusion that there was sufficient evidence to support the theory stated in the instruction, we do not reach the question as to whether Jensen's failure to have properly preserved the question of submissibility for appellate review would prevent our examination thereof, or would require in this case, or if not, in what cases, the application of Supreme Court Rule 3.27, 42 V.A.M.S.

As noted, instruction 2 submitted the negligence of Jensen in failing to stop on the pavement, instead of turning off the pavement, after he reasonably could have foreseen the likelihood of the Cadillac-truck collision. We now consider whether the facts (questioned by Jensen) hypothesized in instruction 2 were based on the evidence. It is Jensen's argument that plaintiff's evidence clearly showed that at the time the "Cadillac changed its direction", i. e., as we understand, when the Cadillac began to skid sideways, there was "most likely" less than 100 feet separating the Chrysler and the Cadillac and, therefore, "it would have been impossible to have stopped the Chrysler short of a collision with the Cadillac."

We think Jensen's position in that respect is untenable for these reasons. The Chrysler could have been stopped in 300 feet. Even if Jensen had no duty to act until the Cadillac brake lights flashed on, that occurred at least 205 feet (Jensen said 290 feet) from the Cadillac-truck collision point. The Chrysler was then 100 feet west of the Cadillac. Consequently the jury reasonably could have found that Jensen had 305 (or 390) feet in which to stop. But the evidence, considered favorably from plaintiff's standpoint, does not make the issue so close. When Jensen was 690 feet from the Cadillac-truck collision point, he actually realized the probability of a collision and, even ignoring his admission to that effect, the jury reasonably could have found that he had a duty to immediately begin to stop (690 feet away) when he saw the truck making a gradual left turn in the path of the Cadillac. Certainly, if Jensen could have stopped in 300 feet and he had over 600 feet in which to stop, there was clearly an evidentiary basis for the theory of recovery submitted in instruction 2.

The only additional attack made on instruction 2 (other than the same attacks made on instruction 1 which have been answered heretofore in a manner equally applicable to the same contentions as to instruction 2) is, that only by speculation and conjecture could the jury have found that Jensen should have foreseen what action Pace would take and the course of the Cadillac thereafter and at a time when more than 300 feet separated the Chrysler and the Cadillac. We cannot agree. The instruction hypothesized that "if you find that Dr. Leland Jensen, in the exercise of the highest degree of care, could have reasonably foreseen the careening and skidding movements of said Cadillac automobile and the collision of said Cadillac automobile and milk truck, in time thereafter" etc. The evidence was that when Jensen was 690 feet from the collision point he did in fact realize the "probability" of a collision between the Cadillac and the truck. Thus, whether he also should have foreseen Pace's action and the careening and skidding movement of the Cadillac was not an essential finding. That finding was submitted conjunctively with the essential finding of foreseeability of the collision. The instruction was, therefore, not erroneous in the respect contended.

Jensen contends that the trial court erred in giving instructions 10 and 11 (on behalf of appellant McCubbin) because, it is said, they authorized a verdict against Jensen if he attempted to pass the Cadillac and

truck when the way was not clear, thus permitting plaintiff to recover on a nonadopted theory of liability. Instructions 10 and 11 hypothesized the sole negligence of Jensen and directed that, if the jury found that plaintiff's injury was caused by Jensen's sole negligence and not by Pace's submitted negligence, plaintiff could not recover against Pace's estate. Instruction 10 hypothesized as Jensen's sole negligence his passing when he knew or should have known that there was not room for safe passage. Instruction 11 hypothesized the obstruction of Jensen's path and his passing the Cadillac and truck at an excessive speed. Our examination of instructions 10 and 11 convinces us that they submitted essentially the same theories as did plaintiff's instructions 1 and 2. That is to say, they submitted essentially Jensen's passing the Cadillac-truck collision point under the circumstances (essentially, failure to stop, the theory of plaintiff's instruction 2) and passing at an excessive speed (essentially the theory of instruction 1). So that (irrespective of other considerations) we may not say that instructions 10 and 11 authorized plaintiff's recovery against Jensen on a theory of recovery not adopted by plaintiff.

Plaintiff submitted his case against appellant McCubbin, administrator, by two verdict-directing instructions. One, instruction 3, hypothesized negligent speed under the circumstances. The other, instruction 4, hypothesized the negligence of McCubbin's decedent in undertaking to pass the milk truck at the top of a hill and in failing to sound his signaling device. We shall first consider plaintiff's recovery theory as embodied in instruction 4. That instruction began with a direction to the jury that, under the law, "no driver shall pass a vehicle from the rear at the top of a hill or on a curve where the view ahead is in any way obscured. An operator or driver overtaking and desiring to pass a vehicle going in the same direction shall sound his signaling device * * *." See: § 304.020(5) RSMo 1949 in effect at the date of instant casualty. Repealed L.1953, H.B. 48, § 1, p. 588. See: present § 304.016. It then hypothesized

that the milk truck was being operated eastwardly and approaching the farm entrance with its left wheels to the north of the center line and in a gradual left turn; that the Cadillac was being operated eastwardly at the crest of the hill 600 feet west of the farm entrance on the north half of the highway; that the Chrysler was being operated eastwardly in the south half of the highway within 100 feet of the Cadillac; that both automobiles were then being operated at 70 or more miles per hour; and "if you find that the driver of the Cadillac automobile was then overtaking said milk truck and was undertaking to pass same at said time and place and if you find that the driver of the Cadillac automobile failed to sound his signaling device before undertaking to pass said milk truck and if you find that the driver of the Cadillac automobile in undertaking to pass said milk truck at the top of said hill and in failing to sound his signaling device, * * * was thereby negligent"; and that as a direct result of such negligence the Cadillac driver applied his brakes and moved partly onto the south half of the highway and skidded into the rear of the milk truck, and that Jensen, the driver of the Chrysler, turned off the pavement to avoid colliding with the Cadillac, and that the Chrysler thereafter struck the culvert and plaintiff was caused to be injured as a direct result of the "aforesaid negligence" of the Cadillac driver or by the combined negligence of the Cadillac driver and the Chrysler driver and the milk truck driver, the verdict should be for plaintiff.

■ It is apparent that the instruction hypothesized, as separate acts of negligence in the conjunctive, undertaking to pass at the top of a hill and failing to sound a signaling device. So that, if the evidence supported either of these hypotheses, and the jury reasonably could find that that one was a proximate cause of plaintiff's injury, there was a submissible case on the theory embodied in instruction 4, and the giving of the instruction was not reversible error. Corley v. Kroger Grocery & Baking Co., 355 Mo. 4, 11 [5], 193 S.W.2d 897, 900 [10, 11].

McCubbin contends, with respect to the hypothesis that Pace failed to sound a signaling device, that the evidence was insufficient to permit the jury to find that he did not sound a horn, but that, in any event, plaintiff's evidence affirmatively disclosed that such failure, if any, could not have been a proximate cause of the collision between the Cadillac and the milk truck or of plaintiff's subsequent injury.

Kennedy, the milk truck driver, testified that he heard no horn, that the left window of his truck cab was down, and that his hearing was "all right"; but that there was no necessity for the Cadillac driver to sound a horn because he (Kennedy) knew that the Cadillac was attempting to pass from the time the Cadillac was 600 feet west of the farm entrance and at least 500 feet west of his milk truck. As heretofore noted, Jensen testified that the Cadillac left the eastbound and went into the westbound traffic lane at a place about 100 feet west of the hill crest. Thus, assuming that there was substantial evidence that the Cadillac's horn was not sounded, the jury reasonably could have found from the evidence that the truck driver had knowledge that the Cadillac intended to pass at a time subsequent to the time he would have had such knowledge had the Cadillac horn been sounded at the time the Cadillac left the eastbound for the westbound traffic lane. That difference in time would have been, of course, the time it took the Cadillac to traverse the 100 feet plus the time it took the horn's sound to travel the 600 feet. Under the evidence, that difference would have been about one half of a second.

Now Kennedy's testimony was such that the jury could find from it that after he was aware of the fact that the Cadillac intended to pass there was some instant of time during which he was undecided as to the course to pursue. That is to say, he hesitated in deciding whether to continue to execute his left turn or to turn back into the eastbound lane. It would seem, therefore, that a warning of intention to pass received even one-half second sooner than he did receive it, would have caused him to have started back to the eastbound lane that much sooner than he did. So that the jury reasonably could have found that if it had been apparent to the Cadillac driver, when the Cadillac was at least 50 feet farther away from the truck, that the truck was returning to the eastbound lane, the Cadillac's driver would not have applied his brakes sufficiently to cause the Cadillac to skid "sideways" into the milk truck and the Cadillac, therefore, probably would have passed safely to the left of the truck. We may not, therefore, say as a matter of law that the failure of Pace to have sounded his horn before he turned from the east to the westbound lane was not a proximate cause of the Cadillac skidding sideways into the milk truck's rear.

We have to this point assumed that there was substantial evidence that the Cadillac horn was not sounded. It has been said that "negative evidence may be invested with positive probative force. But negative evidence, such as 'I did not hear,' is positive and of substantial probative force or value in a situation where it is reasonably certain the witness could and would have heard, that is, where 'it is shown that a witness was in close proximity to the track, in a position or situation to have heard the whistle (or bell) if it was sounded, and was attentive to whether the whistle was in fact sounded'". Chamberlain v. Thompson, Mo., 256 S.W.2d 779, 781 [3, 4]. Instant plaintiff was in a position to have heard the horn. His cab window was down and his hearing was not defective. While there was no direct evidence to the effect that a horn could be heard for 600 feet under the conditions there existing, it seems reasonable to say that a jury could find that it could have been. And the circumstantial evidence was that the truck driver was attentive to whether a horn was in fact sounded. This, because the evidence was that from the time Kennedy left the hill crest he gave continuously an arm left-turn signal; he intended to turn left; he was watching; and he was charged by law with exercising the highest degree of care in executing the intended left turn. Under these circumstances, the attentiveness of the truck driver was inferable.

We conclude, therefore, that there was evidence of substantial probative value that Pace failed to sound the Cadillac's horn before he turned from the east to the westbound traffic lane and that the jury reasonably could have found that such failure was a proximate cause of the Cadillac striking the milk truck.

But McCubbin says, even so, the jury reasonably could not have found that the failure to sound a horn was a proximate cause of Jensen's turning off the pavement and driving more than 200 feet into collision with a culvert. We cannot agree. Without again discussing the evidence in detail, we are of the opinion that if, as we have held, the jury reasonably could have found that Pace's negligence was a proximate cause of the Cadillac-truck collision, it reasonably could have found also that such negligence was a proximate cause of Jensen's turning off the pavement to avoid a collision with (or an apparent collision with) the Cadillac. We have noted heretofore that the fact that Jensen may have been guilty of other negligent acts, after leaving the pavement and prior to the collision with the culvert, would not necessarily relieve him of liability for any negligence which proximately caused him to turn off the pavement. And we have said that a jury could have found that Pace's negligence was a substantial factor in causing Jensen to turn off the pavement and that Jensen's leaving the pavement was a substantial factor in causing plaintiff's injuries. Thus, McCubbin's decedent may not be absolved of liability unless the negligence of Jensen was so extraordinary as not reasonably to have been in the contemplation of such decedent. Champieux v. Miller, Mo., 255 S.W.2d 794, 797 [3]. We think that we may not say as a matter of law that Jensen's negligence, either in negligently contributing to bringing about a situation which made it necessary or seemingly necessary for him to turn off the pavement, or his negligence, if any, thereafter, which resulted in the Chrysler's overturning, were not probable consequences reasonably foreseeable by Pace or such as would break the chain of causation between McCubbin's decedent's negligence and injury to plaintiff. Of course, the exact manner in which plaintiff was injured need not have been foreseeable. Mrazek v. Terminal R. Ass'n of St. Louis, 341 Mo. 1054, 1060 [3], 111 S.W.2d 26, 29 [5–7]. Viewing the entire transaction after the event, the jury reasonably could have found that, and it was the jury's province to determine as a matter of fact whether, plaintiff's injury was a probable consequence of Pace's failure to sound a horn at the time noted. Giles v. Moundridge Milling Co., 351 Mo. 568, 576 [5], 173 S.W.2d 745, 750 [6–8]; Hogan v. Fleming, 317 Mo. 524, 535–538, 297 S.W. 404, 408, 409; Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 819 [4], 211 S.W.2d 35, 41 [6, 7]; Domitz v. Springfield Bottlers, 359 Mo. 412, 415–417, 221 S.W.2d 831, 832–834; Dodson v. Maddox, 359 Mo. 742, 751, 752, 223 S.W.2d 434, 438 [8], 439 [9]. And see: Louisville & N. R. Co. v. Beatrice Foods Co., Mo.App., 250 S.W. 2d 825, 828 [3–5]; Greer v. St. Louis Public Service Co., Mo.App., 87 S.W.2d 240, 244 [5] [7]; Browne v. Creek, 357 Mo. 576, 583 [3], 209 S.W.2d 900, 904 [8–11]; Brooks v. Menaugh, Mo., 284 S.W. 803, 805 [6–8].

McCubbin contends that instruction 4 was erroneous in that it gave the jury "a roving commission to develop a theory of liability and in permitting the jury to speculate as to the existence of the essential facts." We shall attempt to deal with the specific points in McCubbin's argument in support of the foregoing assertion which are not necessarily answered by what we have heretofore said and which pertain to the submission of failure to sound a horn.

It is claimed that the instruction erroneously fails to require a finding that Pace knew or should have known the Chrysler was traveling behind the Cadillac, and (at least in connection with instruction 3 hereinafter considered) that Pace's speed or failure to sound a horn was likely to endanger plaintiff as a passenger in the Chrysler. We think it was not essential

to hypothesize the suggested facts. The jury was required to find that the Chrysler was in fact being driven eastwardly in close proximity to the Cadillac. Pace, in turning from the east to the west traffic lane, was undoubtedly, in the exercise of the highest degree of care, chargeable with knowledge of the proximity of the Chrysler and of the fact that it would continue eastwardly. But, in any event, Pace was required to exercise the highest degree of care not to injure the occupants of *any* vehicle using Highway 166. It would appear not of essential consequence, therefore, whether the jury found that Pace knew specifically of the presence and proximity of the Chrysler. He was bound, as a matter of law, to have known that there might well be other eastbound traffic on a public highway close enough to him that the operation of his Cadillac into collision with a truck partially in the eastbound traffic lane would be likely to endanger passengers in other eastbound automobiles which were in the position which the Chrysler occupied. So that the essential finding, and one which the jury was required to make, was that the Chrysler was in fact proceeding eastwardly 100 feet to the west of the Cadillac.

 Nor can we agree with McCubbin that the instruction was reversibly erroneous for failure to require the jury to specifically find that had the horn been sounded Kennedy would have heard it and would have turned to the right before Pace applied his brakes. That was a conclusion which the jury was warranted to draw from the evidence and from the facts hypothesized in the instruction. On questions of proximate cause the jury must be permitted to reason from the evidence and from the submitted findings of fact. The facts hypothesized were sufficient to authorize the jury to reach the conclusion that had the horn been sounded before Pace turned from the east to the westbound traffic lane, Kennedy (the milk truck driver) would have acted sooner in getting back to the eastbound lane and the necessity for violent application of the Cadillac brakes would have been obviated.

McCubbin also contends that the instruction was "argumentative, lengthy, repetitious, misleading, and abstract." True, the instruction is long and it is not a model, but our examination of it convinces us that it is not reversibly erroneous for any of the aforequoted reasons.

McCubbin next contends that the evidence was "insufficient to warrant the finding that under the existent circumstances Pace was driving his automobile at a negligently excessive rate of speed or, if so, that such negligence proximately caused Jensen to run into the culvert and injure Snyder [the plaintiff]." There was evidence which justified the jury in finding that when Pace turned from the east to the west lane for the purpose of passing the milk truck 600 feet away he was driving 70 to 100 m. p. h.; that he then saw (600 feet away) the milk truck either to the left of the center line or approaching the center line indicating an intention to make a left turn or to enter the westbound traffic lane for some purpose; that Pace, nevertheless, continued at an undiminished speed until about 205 feet from the collision point; that he there applied his brakes and skidded forward for 45 feet, then sideways for another 160 feet into the left rear of the milk truck. It seems apparent that the jury reasonably could have found from such evidence that Pace's speed was dangerous and excessive and was a proximate cause of the Cadillac striking the milk truck. Certainly a jury could have found that to begin to pass a truck at a speed of 70 to 100 m. p. h., when the truck was evidencing, in any manner, an intention to execute a left turn, constituted negligence; and certainly a jury could have found in the instant case that but for its rate of speed the Cadillac would not have gone out of control and would not have skidded into the truck.

We need not again consider the proposition as to whether speed, if a proximate cause of the Cadillac-truck collision, was also a proximate cause of plaintiff's injuries. This, because what we have said heretofore on this question with respect to Pace's failure to sound his horn is equally applicable

to and decisive of the question as it involves excessive speed.

McCubbin contends that instruction 3 was erroneous because the circumstances submitted did not justify the jury in finding negligent speed and because essential circumstances were omitted and ignored. It is said that the instruction was deficient in failing to require these findings: that the truck driver did or did not signal his intention to turn left or that the truck's left turn was begun before Pace was in the westbound traffic lane; that Pace knew that Jensen's Chrysler was proceeding eastwardly behind the Cadillac and that Pace's speed was likely to place Jensen and plaintiff in danger. And further, that no finding was required pertaining to the propriety of the application of Pace's brakes, and that the jury was left to speculate in order to connect Pace's prior speed with plaintiff's subsequent injury sustained when the Chrysler collided with the culvert.

It is true that the instruction (like instruction 1 as to Jensen) hypothesized a situation existing *after* Pace was in the westbound lane. It hypothesized that the milk truck was at the time 500 feet away in the act of making a gradual left turn toward the farm entrance. (We cannot agree with McCubbin that there was no evidence to justify a finding that the milk truck was then engaged in turning left. Jensen's testimony, while perhaps subject to different interpretations, was, nevertheless, sufficient to authorize the jury to find the relative positions of the vehicles as hypothesized.) We are unable to see how the fact that the instruction hypothesized the relative vehicle positions *after* Pace was in the westbound traffic lane was of any decisive significance. If Pace's speed was then 70 or more miles per hour and continued for any length of time (and the jury could have found that the speed continued until the Cadillac brakes were applied) the jury was justified in finding that such speed was a proximate cause of the Cadillac striking the truck.

Nor was it essential to hypothesize a finding as to whether the milk truck driver gave a left-turn signal. Such was an evidentiary fact. The essential fact hypothesized, and which the jury was required to find, was that the truck was at the time engaged in making a gradual left turn.

We have heretofore, in connection with instruction 4, held that it was not essential to hypothesize either that the Cadillac driver knew or should have known of the presence and proximity of the Chrysler or that Pace's speed was likely to endanger the safety of the occupants of the Chrysler.

■ And we believe that it was not essential to hypothesize a more specific finding with respect to the propriety of the application of the Cadillac brakes. The instruction in effect required the jury to find that the Cadillac brakes were applied at a time when the Cadillac had continued for some distance at an excessive and dangerous rate of speed and that after the brakes were applied the Cadillac skidded into the milk truck. The manner of that skidding was described in the evidence and from such evidence the jury reasonably could have found that the brakes were applied at a speed, at a time, and in such manner as to cause the Cadillac driver to lose control of the automobile. We think, therefore, that any further hypothesis of the "propriety" of the application of the brakes was not essential.

■ And the instruction hypothesized facts from which the jury reasonably could have found that the collision between the Cadillac and the milk truck was a direct contributing cause of the Chrysler turning off the pavement. We have held that if the jury so found then it was a jury question as to whether Pace's negligence was a proximate cause of plaintiff's subsequent injury. As we have noted, there was no dispute in the evidence as to what Jensen did after the Chrysler left the pavement. There were no conflicting fact issues involved on that aspect of the matter. Appellant McCubbin's instructions 10 and 11 hypothesized Jensen's negligence in leaving the pavement and in subsequently colliding with the culvert as the sole proximate cause of plaintiff's injury. Under the circumstances, we think the instructions, at least when instructions 3, 4,

10, and 11 are considered together, sufficiently submitted the issues as to whether Pace's negligence in either of the respects submitted was a proximate cause of plaintiff's injuries.

McCubbin contends that the trial court erred in allegedly permitting plaintiff's medical witness, Dr. Robert J. Mueller, to base his ultimate conclusion as to the fact of, and the nature of, plaintiff's brain injury partially upon hearsay evidence. The record, as it pertains to this question, shows that Dr. Mueller testified: that as part of his examination of plaintiff for the purpose of giving expert testimony, he ordered an electroencephalogram on the patient; that the electroencephalogram was done under witness's direction at the Washington University School of Medicine, where witness was "in charge" of the Department of Neurology and Psychiatry; that the roentgenographic plate made in encephalography is a record of the electrical discharges of the brain which, in the event of the presence of certain brain diseases, will disclose a different pattern than when a brain is not diseased; that witness interpreted plaintiff's electroencephalogram so made and had with him on the witness stand a portion of the graph and his interpretation thereof; that the electroencephalogram indicated a disorder within plaintiff's brain which witness took into account in arriving at his conclusion as to plaintiff's trial-time brain condition.

During the doctor's direct examination, Jensen's counsel interposed an inquiry which developed that the actual electroencephalogram had been made by a technician at the school; whereupon McCubbin's counsel's objection that "For the record, I object to it on the grounds it is hearsay" was overruled. Plaintiff's counsel then developed that the doctor's testimony as to what the graph showed was based on the witness's own interpretation of it. Mc-Cubbin's counsel's further objection, that "The persons who made the chart would have to identify it. It has not been identified", was overruled.

It is apparent from the record reviewed above that the sole question involved is whether the electroencephalogram was sufficiently identified as one properly performed on plaintiff. The witness did not base his testimony on another's interpretation of the graph. On the contrary, his opinions were the result of his own interpretation of a graph made at his request and under his direction. If the graph was in fact the result of a test properly performed upon plaintiff under the witness's direction, then clearly the doctor's testimony was not hearsay and was not based upon hearsay.

We think the doctor's testimony that the graph was made at his request and under his direction, in view of the fact that witness was the head of the department in which the test was performed, was sufficient to identify the graph as the result of a properly performed test upon plaintiff. In the absence of some showing by cross-examination or otherwise, which would indicate that the doctor did not know whether the graph was the result of a test properly performed on plaintiff, we think we would not be justified in convicting the trial court of error in admitting the doctor's testimony based on his interpretation of the graph. Perringer v. Lynn Food Co., Mo.App., 148 S.W. 2d 601, 610 [19]; Clark v. Reising, 341 Mo. 282, 286 [3], 107 S.W.2d 33, 35 [5, 6]; Very v. Willi, Mo.App., 293 S.W. 500, 502 [4].

Both appellants contend that the $40,000 verdict is grossly excessive. We review the evidence bearing on that question from a standpoint favorable to plaintiff and give him the benefit of all reasonable favorable inferences from that evidence.

Plaintiff, 66 (with a life expectancy of 13.81 years) at the time of the casualty, was a railroad switchman, having worked 30 years continuously until the accident for the Terminal Railroad Association of St. Louis. He was eligible for retirement at trial time. He had not retired and was not subject to any top age retirement limit. His daily pay for a 40-hour week was $16.10, with time and a half for overtime.

His yearly wage (gross) was $4,186 which (plaintiff did not testify) the jury could have found was the amount of wages he had lost to the time of trial based on the reasonable inference that he had been unable to and had not worked at any employment since the casualty. He had incurred medical and hospital expenses totaling $1,156.75. Prior to the accident he was in good health and able mentally and physically to discharge the duties of a switchman. (He had passed a routine physical examination required by his employer just three weeks prior to the casualty.)

Plaintiff was unconscious for a time following the casualty. He was taken to a hospital at Monett where, when he was examined three hours after his admission and after emergency treatment, he was irrational and complained of pain in his mid-back, lower chest, and left ankle. He was in moderate shock, his blood pressure low, and his pulse rapid. He had a laceration over his left eye which had been bandaged during emergency treatment. X-rays disclosed a compression fracture of the body of the first lumbar vertebra for which a hyperextension body cast was applied. His left ankle was fractured in two places—one a complete fracture of the tip of the large bone in the lower leg on the inside surface of the heel extending into the joint surface, with bone displacement of about one-fourth inch; the other, an incomplete fracture of the body of the distal end of the tibia which extended into the joint surface and upwardly into the tibia for about two inches. His left leg was placed in a "long-leg" plaster cast extending from midway between the knee and thigh down to his toes. He remained in St. Vincent's Hospital at Monett from February 8 until March 2, 1953. He was completely irrational and disoriented and at times in a semicomatose state during the first 12 days of his hospitalization. Subsequently, he had lucid moments but continued to be disoriented and at times had to be physically restrained. The attending physician at St. Vincent's diagnosed a brain concussion believing, from his observation, that plaintiff had suffered some type of brain injury, but made no specific diagnosis as to its nature and extent. Treatment, besides the mentioned casts, consisted of bed rest and the administration of sedatives and opiates.

On March 3, 1953, plaintiff was moved to the Missouri Pacific Hospital in St. Louis where he remained until April 10. During his stay there, he was irrational and at times had to be strapped in his bed. His brain injury was diagnosed by hospital staff doctors as "Karsakoff's psychosis." The out-patient records showed that he returned to the hospital for examination and treatment on ten occasions in 1953 and on one occasion in 1954. (Instant case was tried in February 1954.)

A neurologist who examined plaintiff on three occasions was of the opinion that plaintiff had suffered a traumatic encephalopathy which the doctor described as a disease process in which the individual suffers damage to the brain structure and in which, because of trauma, there is a definite involvement of the brain cells; this traumatic process may be in the form of a gross tearing of the brain, or a splitting of the brain substance, or in the form of small hemorrhages throughout the brain substance which produce a loss of tissue. The doctor was of the opinion that the brain injury was caused by the accident, was permanent, and that as a result thereof plaintiff could never do the work of a railroad switchman and was capable, because of his brain injury, of doing only menial tasks, and then only if closely supervised. The doctor described plaintiff (as the result of the brain injury) as a man who is not sharp or acute, who hesitates and forgets, who has a low level of activities, and who "isn't here."

An orthopedic surgeon who examined plaintiff testified that, as a result of the compressed fracture of the first lumbar vertebra, its anterior portion had been decreased approximately 30 per cent, the fracture had resulted in a noticeable kyphos or prominence "over the dorsal spinous processes of the mid-spine", the motion of the back was limited, and there was a mild tenderness in the lumbar spine at the site of

the kyphos. The fracture had caused the collapse of the vertebra producing an angulation of the spine at that place resulting in a "weak spot in his spine * * * a mechanical derangement in the weight bearing of the spinal system" which would cause the pain of which plaintiff complained at the time of the examination. Plaintiff will continue to suffer pain in his back, the amount depending upon the rest he obtains.

There was a mild atrophy of the left leg below the knee, some weakening of the capsule of the left ankle joint and muscle spasm in the left hip. The fractures in the ankle joint had resulted in permanent arthritis in the ankle. The condition in the ankle would cause pain. Plaintiff walked with a definite limp. The ankle pain is likely to persist and, because of the fractures of the back and ankle and their results, plaintiff cannot do manual labor for the rest of his life.

Defendants, in support of their contentions that the verdict is grossly excessive, have cited Higgins v. Terminal R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380; O'Brien v. Louisville & N. R. Co., 360 Mo. 229, 227 S.W.2d 690; Prince v. Kansas City Southern Ry. Co., 360 Mo. 580, 229 S.W.2d 568; Smiley v. St. Louis-San Francisco Ry. Co., 359 Mo. 474, 222 S.W.2d 481; Enyart v. Santa Fe Trail Transp. Co., Mo., 241 S.W.2d 268; and Murphy v. Fred Wolferman, Inc., 347 Mo. 634, 148 S.W.2d 481. Plaintiff, to support his contention that the verdict is not excessive, has cited Warning v. Thompson, Mo., 249 S.W.2d 335, 30 A.L.R.2d 1176; Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681, 682; Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 729, 223 S.W.2d 418, 428; Amos v. Southern Ry. Co., Mo., 273 S.W.2d 155, 160; Sneder v. Wabash R. Co., Mo., 272 S.W.2d 198, 209, 210; and Renner v. Wolverton, Mo., 273 S.W.2d 325, 332, 333. We have examined all of these cases and have taken them into account in arriving at our conclusion herein. No useful purpose would be served by analyzing them herein. We think that the brain injury sustained by plaintiff in this case is more serious and of more devastating effect than those considered in O'Brien v. Louisville & N. R. Co., supra, and in Higgins v. Terminal R. Ass'n of St. Louis, supra, in which judgments were approved in the amounts of $30,000 and $27,500 respectively. It is true that plaintiffs in those cases were considerably younger than plaintiff in the instant case, although their earnings were less. We approved a $45,000 judgment for a 65-year-old plaintiff in Warning v. Thompson, supra. We think Warning's total physical picture was more serious than that of instant plaintiff. Warning's loss of wages to trial time was $14,800. In Cruce v. Gulf, M. & O. R. Co., supra, plaintiff was 62 at casualty time, 64 at trial time. The injuries there were disabling but no more so than those of instant plaintiff. We approved a $40,000 judgment. Instant plaintiff was four years older than Cruce, which, when considering ages in the 60's, is of some importance. We must and do take into account that plaintiff was 67 at trial time. We note, however, that plaintiff was in good health prior to the instant casualty and recently had been approved as physically and mentally equipped to perform his switchman's duties; and that there was no age limit at which plaintiff must have retired from active work. We note also that, while the evidence showed that plaintiff in the future could perform menial tasks if closely supervised, still the jury reasonably could have inferred that to destroy plaintiff's ability at his age to continue in the employment in which he had been engaged for 30 years was, in effect, to destroy his earning capacity during the remainder of his life.

Questions of claimed excessiveness of verdict usually, as here, are difficult to resolve. We recognize that the amount of a verdict is primarily a matter for the determination of the jury. Yet we, as an appellate court, attempt to maintain an approximation of reasonable uniformity of judgments in personl injury cases. Attaching paramount importance to the fact that the jury in the instant case reasonably could have found that plaintiff sustained a serious and permanent brain injury, taking into account his loss of wages to trial time, his probable future loss of wages, his medi-

cal and hospital expenses, his pain and suffering, the permanent arthritis of his left ankle, the permanent angulation of his spine, but recognizing that at trial time plaintiff was a 67-year-old railroad switchman, we are of the opinion that the maximum judgment which should be approved in this case is $35,000. If plaintiff will, within fifteen days, enter here a remittitur in the sum of $5,000, the judgment will be affirmed for $35,000 as of the date of the judgment below with interest thereon from that date. Otherwise, the judgment will be reversed and the case remanded for a new trial.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.